Matter of Joseph L. Sr. v Cathi C. (2005 NY Slip Op 51265(U))

[*1]

Matter of Joseph L. Sr. v Cathi C.

2005 NY Slip Op 51265(U)

Decided on August 10, 2005

Family Court, Orange County

Klein, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 10, 2005

Family Court, Orange County
In the Matter of a Proceeding under Article 6 of the Family Court Act, Joseph L., Sr., Petitioner,
against
Cathi C., Respondent.
V-1720-01/04B

Carol S. Klein, J.
The Court has before it three petitions. The first petition was filed by Mr. L. seeking an order modifying a prior order of custody and granting him physical custody of his two children, SV and D L.. The other two petitions are violation petitions also filed by Mr. L.. The first violation petition was filed October 7, 2004 and asserts that Ms. C. violated the terms of a prior order as they pertained to Mr. L.'s visitation rights. This occurred when Cathi C. abruptly relocated from Orange County to Long Island with the couple's two children and allegedly without his consent. At the initial appearance in connection with that petition, this Court directed Ms. C. to provide Mr. L. with a visitation as set forth in the most recent order.
 The second violation petition filed by Mr. L. alleges that after the parties appeared in court on the first petition and this Court directed the Respondent to comply with the existing visitation schedule, she continued to deny Mr. L. his visitation with the children.
The instant matter was tried before this Court over several days. The Court is granting the relief sought in Mr. L.'s petition for a modification of custody for the reasons set forth herein and is denying the relief sought in Mr. L.'s violation petitions for the reasons set forth herein.
HISTORY
The Court notes that the history of this case is relevant to its final decision and sets the stage for the dramatic change to be ordered by this Court. Custody in this case was initially determined in a March 26, 1999 order issued by former Family Court Judge McGuirk (now Supreme Court Justice). In that order, custody of SV L. was granted to Cathi C. by stipulation in open Court. Mr. L. was granted liberal visitation rights as agreed upon by the parties. A second [*2]order was issued in October of 2001 on consent of the parties granting sole custody of a second child, D L. to Cathi C. with specified visitation to Mr. L. that was to be supervised on Saturday from 10:00 a.m. to Sunday at 10:00 a.m.. A third order was issued by this Court on April 17, 2003, upon consent of all the parties wherein the parties agreed to share joint custody of the children with physical custody to Cathi C.. Mr. L. would have unsupervised visitation rights on alternate weekends with the children and the parties agreed to work towards overnight visitation rights.
In the fall of 2004, the three instant petitions were filed. During the trial of this case, the Court heard testimony from Mr. L., his fiancé, Patricia CN., Nancy L. his former spouse, Ms. C., and her husband Christopher C., and makes the following findings of fact.
Cathi C. has long been the custodial parent of the two children at issue, SV and D L.. SV is seven (7) and D is six (6) years old. They attend school and at the time of the hearing were in 1st grade and kindergarten respectively. The Court conducted an in camera interview (Lincoln Hearing) with SV and found her to be a very bright, knowledgeable seven year old. She appears to be a happy adjusted child, but one who is well aware of her surroundings and situation.
Cathi C. is also a self admitted alcoholic. She lost her driver's license as a result of a felony DWI conviction and is on probation for a period of five (5) years. She attends AA and NA meetings on a very regular basis but admittedly continues to have slips every now and again. [FN1]
The most troubling aspect of Cathi C.'s life is her instability more so than her alcoholism and failed recovery attempts. The Court heard persuasive testimony about a very non-traditional marital relationship that Ms. C. has with her current husband, Christopher C., and her intermittent extramarital relationships.
Mr. and Mrs. C. were married in 1991 and have remained married for the past 14 years. They have two biological children together, Kelly C. age 12 and Jesse C. age 10. Ms. C. has a son Michael from a previous relationship whom Mr. C. has adopted. Michael is age 21 and out of the home in the Navy.
During the time of the C. marriage, Cathi has had a minimum of three extramarital affairs. The first relationship during Ms. C.'s marriage was with Mr. L. commencing in 1997. While with Mr. L., Cathi became pregnant with SV and thereafter with D. Ms. C. ultimately left Mr. L., citing abusive behavior and returned with SV and D to her husband's home and resided there with all of her children.
The second extramarital relationship occurred sometime after 1999, when Cathi and Chris C. decided their marriage was not going to work. At that time, Cathi befriended Dwayne MK who resided in Virginia. The two decided they were going to get married. Mr. MK moved to the Orange County area, but not having a place to reside moved into the C. household with Cathi. The two shared a bedroom on the lower level together while Mr. C. remained in the marital bedroom. All of the C. children (of which there are three) and the two L. children also resided there. That relationship ended after 4 or 5 months and Mr. and Mrs. C. reconciled.
Some time in late 2003 or early 2004, Cathi began a relationship with another man, Kurt [*3]A. who resided on Long Island. In June or July of 2004, Cathi C. moved to Long Island to reside with Kurt A., taking D and SV L. with her. According to Ms. C.'s own testimony, Mr. A. became abusive in their relationship and she decided to end it. She returned to reside with her husband, Chris C. in November of 2004.
At the conclusion of the hearing in this matter, Ms. C. was still residing with her husband, Chris C.. She claimed that all three of the extra marital relationships ended because of abusive behavior.
The household where Mr. and Mrs. C. live is a three bedroom ranch which sits on approximately three acres. Mr. C. has owned the home since 1979. At the present time, Mr. C. shares a bedroom with his wife, Cathi C.. The boys, Jesse C. (10) and D L. (6) are in one bedroom with bunk-beds. The girls, Kelly C. (12) and SV L. (7) share the other bedroom also with bunk-beds.
Mr. C. is not employed, but collects a union disability pension, as a result of a heart condition. Cathi C. does not work outside of the home and advised the Court that she does not intend to do so for a very long time. Ms. C. has claimed to be religious and having found her Lord. She further asserts that she had home schooled the children to keep them away from bad influences.
There is no doubt that Mr. C. is the primary care provider in the C. household. The L. children refer to him as Daddy or Chris Daddy. He has been in their lives since they were very young and remains so, as long as Cathi continues to reside with him.
Joseph L., Sr., is the biological father of SV and D L.. He resides in a double wide-trailer in Slate Hill, with his fiancé, Patricia CN.. Ms. CN. has custody of her three children who reside with them. Ms. CN.'s children are Gregory CY (age12), NiC. CY (age 10) and Kori CY (age 5). The children's father is not involved in their lives.
Mr. L. was previously married to Nancy L. from 1982 until 1997 when they became legally separated. Joseph and Nancy L. have four children together, Joseph Jr., (age 22), Steven (age 17) and twins Michael and Christopher (aged 12). The L.'s share joint legal custody of the boys with primary physical custody to Mrs. L.. Visitation occurs every weekend with the twins. The older two visit their father a couple of times a month depending on their own schedule as they are older and drive themselves. According to both parents, the three boys still in school are on the high honor roll and have a good relationship with their father.
Mrs. L. testified on behalf of her former husband, stating that he is a good father and that she is able to get along with him. But that was not the case when he was residing with Cathi C.. Cathi was frequently intoxicated and violent around the children and to Nancy L. herself. There were altercations and phone calls in the middle of the night. At one point, as a result of an altercation between the two women, an Order of Protection was issued in favor of Cathi C. and against Mrs. L.. Subsequent to that order, Mrs. L. was charged with violating the order when she contacted Mr. L. to notify him that one of their sons had been hospitalized. Mrs. L. advised that her custody order required her to keep Mr. L. apprised of such situations. However, Ms. C., who answered the phone in response to that call, called the police to have Mrs. L. arrested for violating the Order of Protection.
This Court found Mrs. L.'s testimony to be credible and not self serving. Mrs. L. indicated that she has no difficulty with Mr. L. and found him to be a good father. The only time [*4]she had problems with him was when he was with Cathi C..
The accommodations in Mr. L.'s home are similar to the C. home. He resides in a double wide trailer that has three bedrooms. The girls share one room with bunk-beds and the boys share the other room with bunk beds. When his twin sons visit on the weekends, the boys will sleep on a pull out sofa.
Mr. L. testified that he prepares meal for his children and tries to prepare healthy meals of meat and vegetables. He was concerned that SV and D do not eat healthy meals while in the care of their mother. He also stated that he makes sure homework is done and that he engages in many activities with the children when they are there. Mr. L. is particularly unhappy that his children refer to Mr. C. as Daddy and him as "Joe Daddy". He believes that is inappropriate since he is their father.
Mr. L. is employed as a pressman with a local newspaper and has been employed there for 21 ½ years. He also works at a family restaurant/bar in Circleville, called the GS. He works there evenings from 6pm until 11pm, but indicated he would be willing to give that up should he receive custody of his children.
There are unresolved or unclear issues regarding Mr. L.'s use of alcohol or drugs. Some reports indicate Mr. L. recounting past problems with alcohol, but he currently denies that. He states that he does not keep alcohol in the home and occasionally has a beer after a softball game on the weekend. There was incidents of violence during his relationship with Cathi C., but no other indication that Mr. L. engages in domestic violence or abusive behavior.
The Court heard from Mr. L.'s current fiancé, Patricia CN. who also recited difficult times with Ms. C.. She also recounted a time when D and SV appeared for visitation with head lice about which Ms. C. did nothing. Ms. CN., utilized a home remedy to remove the lice eggs and clear up the problem. Although, Ms. CN. asked Mr. L. to address this with Ms. C., the children continued to arrive for visitation on other occasions with head lice.
VISITATION
Clearly there are times when visitation has been strained and difficult between the parties in this case. Neither parent seems to be able to behave in an appropriate manner when it comes to cooperation about the children. Historically, Mr. L. was not very involved in the early part of his children's lives. His visitation was sporadic and non-committal at times. Earlier Mental Health Evaluations did not portray Mr. L. as a warm, comfortable parent to SV and D. Moreover, during the period of time that Mr. L. was with Cathi C. in a relationship, many witnesses portrayed both as violent, abusive and chaotic. However, subsequent to this Court's order of 2003, Mr. L. began having more and more regular visitation with SV and D. The order required the parties to work towards unsupervised, and ultimately overnight and more lengthy visits. These did occur and until such time as Cathi C.'s already chaotic life spun out of control again, regular weekend visits were occurring relatively smoothly. An interruption in this regular visitation occurred however, with Cathi's abrupt relocation to Long Island to reside with another paramour, leaving her husband Chris C..
That relocation created problems for Mr. L.'s visitation. Both parties claim victim in the problems of Mr. L.'s visitation, but the responsibility of keeping Mr. L. apprised of his children's whereabouts and maintaining regular visitation lies with Ms. C.. She is the custodial parent and is charged with fostering a relationship with the children's father. Her move to Long Island [*5]without consulting with Mr. L. and having no regard for his visitation rights is in direct contravention of the children's best interests.
This Court does not fully believe that while Ms. C. was in Long Island that Mr. L. was unable to locate her. But there is no doubt that her actions wholly disregarded Mr. L.'s visitation rights to the detriment of the children's best interests.
CONCLUSIONS OF LAW
In deciding the issue of custody the primary consideration is "what is in the best interests of the children" (See e.g. Eschbach v. Eschbach, 56 NY2d 167(1982); Freiderweitzer v. Freiderweitzer, 55 NY2d 89 (1982); Obey v. Degling, 37 NY2d 768(1975)). In making the determination neither parent has an inherent, prior right to custody (Dom. Rel. Law §§70, 240); Barkley v. Barkley, 60 AD2d 954 (3d Dept 1978), aff'd 45 NY2d 936(1978)). Among the factors to be considered in these matters are: (1) the original placement of the child, (2) the length of that placement, (3) the child's desires, (4) the relative fitness of the parents, (5) the quality of the home environment, (6) the parental guidance given to the child, (7) the parent's financial status, and (8) his or her ability to provide for the child's emotional and intellectual development (Kuncman v. Kuncman, 188 AD2d 517, 518 (2d Dept 1992)). In addition, the court must consider the care and affection of the respective parents toward the children, the availability and ability of the parent to provide for the children, as well as the stability and morality of the parents (See e.g. Bliss v. Ach, 56 NY2d 995 (1982); Jacobs v. Jacobs, 117 AD2d 709 (2d Dept 1986); Alan G. v. Joan G., 104 AD2d 147(1st Dept 1984)).
When the circumstances permit, children are usually best served when they are nurtured by and have significant contact with both parents (Daghir v. Daghir, 82 AD2d 191 (2d Dept 1982), aff'd 56 NY2d 938 (1982); Olmo v. Olmo, 140 AD2d 677 (2d Dept 1988)).
It is important that neither parent engage in conduct which tends to disrupt regular contact between a child and both parents. A custodial parent's interference with the relationship between a child and the non-custodial parent, which can take many forms (Young v. Young, 212 AD2d 114( 2d Dept 1995)), has been considered an act so inconsistent with the best interests of a child as to per se raise a strong probability that the offending parent is unfit to continue to act as a custodial parent (See, e.g. Maloney v. Maloney, 208 AD2d 603, 604 (2d Dept 1994); Leistner v. Leistner, 137 AD2d 499 (2d Dept 1988); Entwistle v. Entwistle, 61 AD2d 380, 384-385 (2d Dept 1978); see also, Matter of Gago v. Acevedo, 214 AD2d 565 (2d Dept 1995), lv denied 86 NY2d 706 (1995)).
Here, the children, have always resided in the primary care and custody of their mother, Cathi C.. Mr. L.'s position in their lives has not been prominent until more recently when they began having every weekend visitation with him. Such visitation however, was abruptly terminated when Ms. C. relocated to Long Island. The parties have equivalent living arrangements and seem to possess equal or similar financial status. Mr. L. has held the same job for the past 21 years and Ms. C. has no employment outside of the home but is seemingly supported by her husband. If in the continued custody of their mother, the children will continue to reside with their biological half-siblings, the C. children. If custody reverts to Mr. L., D and SV will be separated from these siblings and they will reside with the children of their father's fiancé.
Ms. C. is a self admitted alcoholic who has had a felony DWI conviction resulting in the [*6]loss of her drivers license. Mr. L. has no current arrests or convictions of drug or alcohol related incidents. However, there is a reported history of drug and alcohol abuse. Mr. L. denies that at this point in time. He has never attended nor been administratively discharged from any alcohol or drug program.
The Court has looked at such things as the nurture and teaching of values that these children receive. Ms. C. states that she has home schooled her children so as to avoid them being exposed to inappropriate language, and experiences . On the other hand, she is completely unconcerned about the lesson she herself is teaching her children. She has had three extra-marital affairs during the term of her 14 year marriage to Mr. C.. One such relationship was brought directly into the children's home when she slept in the same bedroom with Dwayne MK in the marital home. She then left her husband again to reside with Kurt A. in Long Island, dragging SV and D with her, only to return "home" again after 4 or 5 months.
Mr. L. did not particularly instill confidence in this Court that he emulates any stronger family values upon which SV and D can be raised. His current life status, however, seems a little more stayed and stable. He is divorced from his prior spouse, Nancy L. and resides with his current fiancé, Patricia CN. and her children. It is unclear to this Court the extent of domestic violence to which SV and D are or have been exposed.
Mr. L. and Ms. C. apparently engaged in quite a tumultuous relationship in the past. To the credit of both they are no longer together and the termination of that relationship seems to at least have toned down the physical chaos.
As far as a direct parenting plan, the Court is concerned that Mr. L. does not have an adequate plan. His current work hours prevent him from being a primary care provider. However, he did indicate a willingness to reduce his working hours should the children come to reside with him and this Court is going to hold him to that commitment.
On the other hand, the parenting plan that Ms. C. has in place is to rely upon Mr. C. as the primary care provider. However, her past history of instability within that household and relationship causes this Court great concern for these children. And while the initial adjustment may be difficult or traumatic, the Court must look at the long term outlook for SV and D. As children of an alcoholic parent they are subjected to certain risks that if not arrested at this point in their lives, can affect them into their own adulthood. Since this Court is charged with determining what is in their best interests, simply looking at a snap shot of time is irresponsible and the Court must consider the bigger picture with a view to the future. That being the case, the Court finds that it is the best interest of SV and D L. to change custody from Cathi C. to Joseph L., Sr. subject to Ms. C.'s visitation rights and Mr. L.'s implementation of the proper parenting plan which is delineated herein.
Now, after due deliberation and upon the evidence and testimony before me it is hereby
ORDERED, that the father shall have sole custody of the children, SV and D L. subject to regular weekly contact with the [mother] as follows: Every first (1st), third (3rd) and fourth (4th) weekend of the month from Friday at 6:00 PM until Sunday at 6:00 PM and two midweek dinner visits with the day to be selected in advance by the mother upon 24 hour reasonable notice to the Father. Such midweek dinner visits shall commence at 5:00 pm and end at 8:00 pm. In addition to the foregoing: it is further
ORDERED, that the mother shall have the children on alternate holidays, which shall [*7]include: New Years Day, Martin Luther King Day, Presidents' Day, Easter Sunday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day and Christmas Day. As to those holidays which occur during the school year, the holiday shall be the day on which the school district the children are attending observes the holiday. The mother's holiday sequence shall begin with September 5, 2005. It is the intent of the court that neither parent will have the children for the same holiday for two consecutive years. Contact on the above, or any other single day holidays set forth below, shall commence at 9:00 AM and end at 6:00 PM unless otherwise agreed upon by the parties; and it is further
ORDERED, that the mother shall be entitled to have the children with her for 4 [non-consecutive] weeks (unless the parties agree otherwise) during the summer vacation period observed by the school district the children are attending; the parent entitled to such summer vacation shall notify the other parent, in writing, certified mail, return receipt requested, on or before May 1st of each year, specifying the week(s) selected for summer visitation; and it is further
ORDERED, that the mother shall have the child(children) on Mother's Day each year; the father shall have the child(children) on Father's Day each year and it is further
ORDERED, that the mother shall have the children on her birthday each year; the father shall have the children on his birthday each year; and it is further
ORDERED, that each parent shall have complete access to all health care records, information and providers concerning all matters relating to the mental and physical well-being of the children; a copy of all health care information received by one parent shall be provided to the other within 48 hours of receipt; each parent, while the children are in his or her care, shall inform the other of any illness, injury or condition which confines a child to bed for more than three days or which requires medical intervention; each parent shall sign releases or other documents necessary and/or required to permit the other to have access to health care information and/or providers; and it is further
ORDERED, that each parent shall have complete access to all school records and all personnel involved with the education of the children; a copy of all report cards, school bulletins and schedules of events, PTA meetings and the like or any other material received from any school the children are attending shall be provided to the other parent within 48 hours of receipt; each parent shall sign releases or other documents necessary and/or required to permit the other parent to have full access to such educational records and/or providers and it is further
ORDERED, that each parent shall advise the other of any special events, dinners, ball games, plays, recitals and the like in which the children are involved and which parents may attend; advice about such events shall be given by one parent to the other within 48 hours of receipt; and it is further
ORDERED, that each parent shall encourage the free exercise of the visitation/custodial rights of the other; neither parent shall do any act or make any statement which would directly or indirectly tend to defeat or make exercising visitation/custodial rights of the other parent more difficult; which would tend to disappoint the children; which is derogatory of the other parent; or, which would discourage the children from contact with the other parent. Neither parent shall allow, condone or encourage any other person to engage in any conduct which is contrary to the above provisions. In exercising custodial/visitation rights each parent shall consider the wishes [*8]and plans of the children; and it is further
ORDERED, that each parent shall arrive on time for any scheduled pick-up or return of the children; the children shall be provided with clean, adequate and suitable clothing for any scheduled visitation period and the same or comparable clothing shall be returned at the conclusion of the visit; and it is further
ORDERED, that neither parent shall expose the children to any conduct or activity which would endanger the physical, mental or moral well-being of the children; and it is further
ORDERED, that each parent shall keep the other advised of his/her current address and telephone number; if a child is to be outside the State of New York for any reason for a period in excess of 72 hours, the parent allowing the children to be at such location shall inform the other parent, in advance, where the child will be and, when possible, the address and telephone number where the child may be reached while outside the State of New York; and it is further
ORDERED, that during any period that the children is/are with one parent, reasonable, peaceful and private telephone contact between the children and the other parent shall be allowed between the hours of 9:00 AM and 7:00 PM; and it is further
ORDERED, that each parent shall keep the other advised of the name and telephone number of any day care provider used on a regular basis or during a school vacation period; and it is further
ORDERED, that transportation to and from all visitation shall be the shared responsibility of the mother and father but if one or the other is unable to transport the children, visitation is not be canceled but the other parent shall ensure that the children are properly transported to and from their visitation; and it is further
ORDERED, that the terms of this order are based on the present residence of the parents. Neither parent shall move more than 50 miles from his/her current residence without first giving the other parent at least 90 days prior notice, in writing. In any event, if the contemplated move is in excess of 50 miles or will significantly impair the visitation/custody rights granted herein, prior court approval of such move shall be obtained, unless both parents agree, in writing; and it is further
ORDERED, that the "BILL OF RIGHTS FOR CHILDREN WHOSE PARENTS ARE SEPARATED" set forth below is made a part of this order and both parents shall respect and comply with each of those rights; and it is further
ORDERED, that the terms of this order shall remain in effect until modified by this court which specifically retains jurisdiction of this matter for the purpose of any such request for modification; and it is further
ORDERED, that neither party shall use or abuse alcohol or illegal drugs while in the presence of the children or within 24 hours prior to seeing the children; and it is further
ORDERED, that in the event the children have an activity, school event, extracurricular activity or sporting event the parent in whose presence the child is at the time shall be responsible for transporting the child to such event. No event shall be canceled due to a visitation schedule conflict; and it is further
ORDERED, that the parent in whose presence the children are at the time shall be responsible for ensuring that each child completes his or her school assignments in a proper and timely manner; and it is further
[*9]
ORDERED, that the removal of Ms. C. from the residence of Mr. C. shall constitute a change of circumstances sufficient to warrant an application to modify the terms of her weekend and other visitation schedule; and it is further
ORDERED, that Ms. C. is to continue her AA and NA meetings as needed and to continue in treatment as needed for alcohol or substance abuse; and it is further
ORDERED, that Mr. L. is to immediately enroll both children in age appropriate counseling for the children to assist them in the transition from their residence with Ms. C. to Mr. L.'s home; and it is further
ORDERED, that Mr. L. is to be sole and primary care provider for the children when in his custody. As such he is to discontinue his employment in his family member's bar/restaurant and provide adequate child care arrangements when is unable to be home with the children; and it is further
ORDERED, that no sanction is imposed for Ms. C.'s prior violations of the Court's prior order at this time and both petitions are dismissed in their entirety; and it is further
ORDERED, that unless specifically addressed herein, all other relief requested by the parties is hereby denied; and it is further
ORDERED, that custody shall be transferred immediately but in no event later than the commencement of the 2005/2006 school year; and it is further
ORDERED, that this order may be enforced by any duly authorized peace or police officer.
This constitutes the decision and order of this Court.
Dated: August 10, 2005E N T E R
__________________________
HON. Carol S. Klein, JFC
Footnotes

Footnote 1: Ms. C. avers that her slips do not necessarily involve her becoming intoxicated but as an alcoholic, having one beer is a slip.